1   November 1st of 1999?  How did that occur?
2   A.   Can you be a little more specific?
3   Q.   Well, you changed jobs.  You went from plans
4   and permits to your present job about a year and
5   a half ago.  How did that take place?
6   A.   The job was posted.
7   Q.   An opening was posted?
8   A.   An opening was posted.  I applied,
9   interviewed and transferred.
10  Q.   And who is your supervisor right now?
11  A.   David Crandell.
12  Q.   And was there a reason why you did bid on
13  the job?
14  A.   I wanted to remove myself from the plans and
15  permits center.
16  Q.   And why is that?
17  A.   Working conditions, stress.
18  Q.   Be a little more specific on working
19  conditions and stress.
20  A.   I had filed some complaints.  As a result of
21  that, my work hours had been changed.  There was
22  bickering among the staff.  I was working out of
23  my job classification.
24  Q.   You understood when you worked in plans and
25  permits that you were under the union contract;

Google, Inc. v. EMSAT Advanced Geo-Location Technology, LLC et al   Doc. 59 Att. 3

1 my lunch hour accordingly to cover the counter.
2 Q. But would you still get an hour every day?
3 A. If not, then we would --
4 Q. It would be reflected here?
5 A. Yes.
6 Q. So if you had to work 50 minutes into your
7 lunch, it would be reflected on the comp time
8 program; is that correct?
9 A. Yes, or our lunch hour would just swing
10 accordingly. If we left 15 minutes late, we
11 would come back 15 minutes later.
12 Q. Okay. Prior to you filing the grievances,
13 were there any meetings in the department
14 regarding the compensatory time keeping system
15 that you're aware of?
16 A. Yes.
17 Q. When did those take place?
18 A. Approximately two months after I came to the
19 department was the first meeting.
20 Q. Okay. And who was at the meeting and what
21 was said?
22 A. At that time, Vicki Elder, Crissi Stevens,
23 DeAnne Bennington, George Jumbert, James Ely and
24 Ernie Chudick and myself.
25 Q. And those were the members of the department

AKRON COURT REPORTERS
330-376-8100

CANTON COURT REPORTERS
330-452-2400

CLEVELAND COURT REPORTEI
216-621-69(

1 at that time?
2 A. Yes.
3 Q. Do you know who called the meeting?
4 A. George Jumbert.
5 Q. Do you know why it was called?
6 A. Yes.
7 Q. Why?
8 A. I had earned comp time for the first time in
9 the department and realized that it was not on
10 my -- it was not reflected on my pay stub, and I
11 asked the payroll clerk about that, and that was
12 when I found out it was not being put on the
13 payroll.
14 Q. And who was the payroll clerk at that time?
15 A. Vicki Elder.
16 Q. Vicki Elder. Okay.
17 A. So I immediately went in and asked George
18 Jumbert about that.
19 Q. And what did George say?
20 A. "That's not how we do it."
21 Q. All right. And then there was subsequently
22 a meeting?
23 A. Yes.
24 Q. What was discussed at the meeting?
25 A. George basically told us that, you know,

1 A. Between Mr. Jumbert and myself, yes.
2 Q. When were they?
3 A. I believe November of '98.
4 Q. And where was that meeting held?
5 A. Mr. Jumbert's office.
6 Q. And what was the purpose of the meeting?
7 A. I asked that my comp time be documented
8 according to the guidelines, meaning being put on
9 the payroll correctly and being paid correctly.
10 Q. So you asked for the compensatory time to be
11 paid to you under the payroll system; is that
12 correct?
13 A. Yes.
14 Q. And what did Mr. Jumbert say?
15 A. He advised me to go out and talk to the
16 other girls, and if that is how we all agreed it
17 should be, then we would do that.
18 Q. Did you do that?
19 A. I told him that I did not feel that was my
20 position, I am addressing my time and my time
21 only and I am not a supervisor, I shouldn't be
22 addressing that.
23 Q. Okay. What did he say?
24 A. Just shook his head and let it go.
25 Q. Okay. So nothing changed at that point?

AKRON COURT REPORTERS
330-376-8100

CANTON COURT REPORTERS
330-452-2400

CLEVELAND COURT REPORTERS
216-621-6969

1  is that correct?
2  A.   Yes.
3  Q.   And you were a member -- and you have been a
4  member of that union since you went into the
5  plans and permits department, correct?
6  A.   Yes.
7  Q.   And were you familiar with the union
8  contract from 1999?
9  A.   Somewhat familiar with it, yes.
10 Q.   You had a copy of it?
11 A.   Yes.
12 Q.   You said you had filed some complaints?
13 A.   Yes.
14 Q.   What were those complaints, specifically?
15 A.   I spoke with Mr. Jumbert about not being
16 paid time and a half for overtime, the fact that
17 that was not documented on the payroll and the
18 fact that I wanted my overtime to be put on the
19 payroll.  I attended some EAP counseling
20 appointments, and then I was told I would have to
21 take personal time, be it sick time or vacation
22 time to attend those appointments.  I was denied
23 flexing my lunch hour.  My work hours were
24 changed.  I was yelled at by Mr. Jumbert and I
25 was berated by staff.

AKRON COURT REPORTERS
330-376-8100

CANTON COURT REPORTERS
330-452-2400

CLEVELAND COURT REPORTI
216-621-6

```
1   Q.   Okay.  And was that also the subject of the
2   meeting with Jim Masturzo?
3   A.   Yes.
4   Q.   How many grievances did you actually file,
5   if you recall?
6   A.   I believe three.
7   Q.   And were they all the subject of that
8   meeting with Jim Masturzo?
9   A.   Yes.
10  Q.   Okay.  Were any of them resolved?
11  A.   The EAP time.
12  Q.   Was it resolved?
13  A.   Yes.
14  Q.   And how was it resolved?
15  A.   The time I was denied was restored.
16  Q.   Okay.  What was the third grievance about?
17  A.   Retaliation for seeking union counsel.
18  Q.   And how was that resolved?
19  A.   I guess you could say that was an
20  understanding that I would try to schedule my
21  union time toward the end of the day or at a time
22  so as not to disrupt the work flow.
23  Q.   So if I understand what you're saying, when
24  you tried to meet with the union, there was a
25  dispute over how that was scheduled with
```

1  Mr. Jumbert?
2  A.    I had asked to meet -- I had left a note
3  that I had a meeting with the union and was told
4  I would have to take personal time to do that.
5  Q.    And then you filed a grievance?
6  A.    Yes.
7  Q.    Was that resolved at this meeting also?
8  A.    Basic informal understanding that we would
9  try to schedule not to interrupt the workday.
10 Q.    So there was an understanding reached
11 between the parties regarding how you would
12 schedule that time in the future?
13 A.    Yes.
14 Q.    And your EAP time was resolved?
15 A.    Yes.
16 Q.    But you said you don't know if your comp
17 time resolved or not?
18 A.    I don't know what ended up happening with
19 that.
20 Q.    Okay. Defendant's Exhibit Number 1, it
21 indicates, as of August, that you had about a
22 half an hour of comp time; is that correct?
23 A.    Yes.
24 Q.    Is that accurate?
25 A.    I believe that's 1.5.

AKRON COURT REPORTERS
330-376-8100

CANTON COURT REPORTERS
330-452-2400

CLEVELAND COURT REPORTERS
216-621-6969