1  compensatory time was contrary to Federal law."
2  Do you see that allegation?
3  A.    Yes, I do.
4  Q.    Would you tell me the facts of that?
5  A.    Let's see.  From 1995 through 1998, I had
6  been hired as a temporary -- or not a temporary.
7  I am sorry.  As a data entry operator.  And at
8  that time, when I was hired, I was told that I
9  would do job -- jobs as needed, but that my sole
10 position was data entry operator.  But I wasn't
11 doing that.  I was doing Permit Clerk I work
12 throughout my employment.
13        And when I went to Mr. Jumbert, in 1998, I
14 asked him if I could have a promotion to Permit
15 Clerk, since I was doing this work already.  And
16 he said that I would have to take a test.  And he
17 made up this test through Personnel.  It wasn't
18 legal.  And he said that if I -- if only three
19 people signed up for this test, then the job was
20 automatically mine.  But if more than three
21 people signed up for this test, I wasn't
22 automatically -- I had to take this test.  But I
23 had to pass it in the top three.  And if I did
24 not pass it in the top three, I went back to
25 doing this work, and getting paid as a data entry

Google, Inc. v. EMSAT Advanced Geo-Location Technology, LLC et al            Doc. 59 Att. 4

1  operator and not a permit clerk.
2  Q.    Okay.  And did -- was it -- did you take the
3  test?
4  A.    Yes, I did.
5  Q.    Do you know how many people took the test?
6  A.    There was approximately eight to ten, I
7  believe.
8  Q.    And --
9  A.    I can't remember.
10 Q.    And how did you do on the test?
11 A.    I didn't score in the top three.  But I
12 can't remember the score that I did receive.
13 Q.    So you were not awarded the job after not
14 being in the top three for the test?
15 A.    Correct.
16 Q.    And how do you know Mr. Jumbert himself
17 constructed the test?
18 A.    He worked that out with Personnel, which was
19 Carolyn O'Brien.
20 Q.    Okay.  So are you aware that this would have
21 been a Civil Service Test?
22 A.    It was a Civil Service Test, yes.
23 Q.    And are you aware in order to be eligible
24 for a Civil Service job, you have to be one of
25 the top three candidates?

1 operator and not a permit clerk.
2 Q. Okay. And did -- was it -- did you take the
3 test?
4 A. Yes, I did.
5 Q. Do you know how many people took the test?
6 A. There was approximately eight to ten, I
7 believe.
8 Q. And --
9 A. I can't remember.
10 Q. And how did you do on the test?
11 A. I didn't score in the top three. But I
12 can't remember the score that I did receive.
13 Q. So you were not awarded the job after not
14 being in the top three for the test?
15 A. Correct.
16 Q. And how do you know Mr. Jumbert himself
17 constructed the test?
18 A. He worked that out with Personnel, which was
19 Carolyn O'Brien.
20 Q. Okay. So are you aware that this would have
21 been a Civil Service Test?
22 A. It was a Civil Service Test, yes.
23 Q. And are you aware in order to be eligible
24 for a Civil Service job, you have to be one of
25 the top three candidates?

1  A. Correct.
2  Q. And was someone awarded the job?
3  A. No. It was just dropped. And those people
4  wondered what happened to that position. But I
5  went back to doing the work.
6  Q. Okay. So you are saying he did this in
7  retaliation because you complained about your
8  work hours?
9  A. I don't know. That is what -- I mean, that
10 is what I feel.
11 Q. What do you -- well, by -- you would agree
12 with me for the fact that you did not place in
13 the top three, you could not be placed in that
14 job; is that correct?
15 A. Correct. But I shouldn't have been made to
16 go back and do the work as a permit clerk when I
17 was not getting paid for it.
18 Q. So your complaint is not that you were
19 denied a promotion, but that you were doing work
20 outside of your classification?
21 A. Basically, but I think I was still denied.
22 Because if I could have taken that position, if
23 those three people didn't sign up, versus I don't
24 pass the test, then he was going to hand it to me
25 if there wasn't more than three people.

1  Q. Well, how was this retaliation against you,
2  then?
3  A. Well, if he was going to hand me the job to
4  begin with, but because I didn't pass, he told me
5  that I had to go back to doing that same work and
6  not get paid for it.
7  Q. Will you agree the allegation -- this says
8  it is in 1998; is that correct?
9  A. Correct.
10 Q. So it says that you complained about your
11 work hours?
12 A. Uh-hum.
13 Q. When did you complain about your work hours?
14 A. It was probably right after me and Liz
15 started talking about the comp time.
16 Q. Could you give me a year?
17 A. She was hired in '96, I believe. And it was
18 within that year, so like within '96, '97.
19 Probably '97.
20 Q. And did you talk to Mr. Jumbert about this?
21 A. Yes, I did.
22 Q. And who was present at that meeting?
23 A. Just me and Mr. Jumbert.
24 Q. What was said?
25 A. I had went in to talk to him about what Liz

1  was talking about, and asked him how fair it
2  was. And I asked him what we could do about it.
3  He said we had to talk things out amongst
4  ourselves. That we had to go to the girls.
5  Q.    Was there a meeting regarding this issue?
6  A.    Later on.
7  Q.    How much later?
8  A.    It was probably after 1998 that Liz really
9  started pushing for the comp time to be put on
10 the payroll.
11 Q.    So it would have been 1999 sometime?
12 A.    Yes. 1998, '99, yes.
13 Q.    Was there only one meeting of the division?
14 A.    Yes.
15 Q.    Regarding this issue?
16 A.    Yes.
17 Q.    Do you have any contemporaneous notes of
18 when it was done?
19 A.    No. But there is a letter that Mr. Jumbert
20 went on from CSPA regarding all the comp time
21 issues.
22 Q.    Was that the settlement in Ms. Kish's
23 grievance?
24 A.    Yes.
25 Q.    Okay. How long before that letter from Mr.

1  meeting of the division take place, if you can
2  recall?
3  A.  I don't believe there was ever a meeting, so
4  to speak.  He had talked to Liz numerous times
5  about the situation.  And I was brought in a
6  couple of times to talk to him.
7  Q.  So you don't recollect any division meeting
8  where the -- all the employees got together and
9  discussed the comp time program with Mr. Jumbert?
10 A.  Just that time with the letter from CSPA.
11 Q.  Let me ask the question again.
12 A.  Uh-hum.
13 Q.  That was -- you do not recall a meeting
14 where the entire department got together and
15 discussed the comp time issue because of Mrs.
16 Kish's complaint about comp time?
17 A.  No.
18 Q.  So there was no such meeting?
19 A.  Right.
20 Q.  The meeting you are discussing is with
21 regard to the CSPA resolution of the issues; is
22 that correct?
23 A.  Right.  She had meetings with George, but
24 not the whole division.
25 Q.  Okay.  And you said you had a couple of

1  meetings with George about the comp time?
2  A.  Correct.
3  Q.  Could you please tell me what you said and
4  what he said at these meetings?
5  A.  The first one was -- basically it started
6  out with flex time, as far as lunch goes.
7  Because if you worked four hours -- let's see.
8  How did that work?  If you worked four hours, you
9  got the lunch.  You got to take your lunch hour.
10 But if you worked three hours, then you weren't
11 supposed to get that lunch hour paid for.  But
12 some people were working three hours and taking
13 their lunch hour.  Some people were working four
14 hours and taking their lunch hour.  So we started
15 talking about that.
16 Q.  And when was this, if you know?
17 A.  It was around the same time.  It was -- all
18 of this was going down with Liz, when she was
19 having meetings with George.  And he said that I
20 needed to figure that out, because some people
21 were getting it and some people weren't.  And
22 that is when the comp time was brought up, as
23 well.
24 Q.  Was this in your duties as a payroll person?
25 A.  Yes.

1  Q. Okay. And for each of the years you worked
2  in the division, there was such a running
3  compensatory time record; is that correct?
4  A. That is correct.
5  Q. Okay. Is this -- would this be a fair
6  example of how much comp time you took each year?
7  A. No.
8  Q. Would it -- so you are saying the years
9  before, there was more time taken?
10 A. Yes.
11 Q. How much comp time do you recall taking in
12 1998?
13 A. I don't know how much comp time throughout
14 the years. But I know for certain when I first
15 came to the department, for the first couple of
16 years, we worked comp time all the time. We were
17 always at the counter. We always worked through
18 our lunches. So we earned a significant more
19 amount than the last few years.
20 Q. When you say "last few years," would that be
21 1997, 1998, 1999?
22 A. Correct.
23 Q. So the last three years, would this be a
24 fair example of how much comp time was being
25 taken?

1  time?
2  A. When Liz started really getting -- talking
3  to the union about it, I guess.
4  Q. Did you ever file a written grievance on the
5  overtime?
6  A. No, I did not.
7  Q. Did you know that Liz Kish had?
8  A. Yes.
9  Q. So you did not file one at that time?
10 A. No, I did not.
11 Q. Even though you were aware that you could
12 have?
13 A. To a point, yes. I didn't want to rock the
14 boat, if that makes any sense.
15 Q. Okay. Uh-hum. What was the other grievance
16 you filed?
17 A. Working out -- being thrown into a position
18 that Liz left. And when I took that to Chuck
19 Victor, he gave me papers then on that to file a
20 grievance.
21             MR. CHILDS:        Okay. Mark that
22 as Number 5, please.
23             (Thereupon, Defendants' Exhibit 5
24             of the Victoria Elder Deposition
25             was marked for purposes of

```
 1              identification.)
 2    BY MR. CHILDS:
 3    Q.    Okay.  Can you identify that for me, please,
 4    if you could?
 5    A.    Uh-hum.  Yes.  This is what we were just
 6    talking about, as far as the papers that Chuck
 7    gave me to file for George when he made me do
 8    Liz's position when she left the Board of
 9    Building Appeals.
10    Q.    And this is the written grievance you filed
11    regarding that issue; is that correct?
12    A.    Yes.
13    Q.    This was resolved after you left the City of
14    Akron, I believe?
15    A.    A year later.
16    Q.    Okay.  Are those the only two written
17    grievances that you filed while employed at Plans
18    & Permits?
19    A.    Written, yes.
20    Q.    And when you say -- were there verbal ones,
21    then?
22    A.    Yes.  About my personal leave without pay.
23    Q.    Explain that, please.
24    A.    When I -- when I went into -- asked George
25    about personal leave without pay, I was asking
```

AKRON COURT REPORTERS   CANTON COURT REPORTERS   CLEVELAND COURT REPORTERS
330•376•8100            330•452•2400             216•621•6969

1  for three months off, because I had some real
2  personal emergency issues. And he said he
3  couldn't do that at the time. And he ended
4  up -- we ended up working out that I would take
5  my two weeks' vacation to try to work something
6  out -- to try to get child care is what it was.
7      And in that two weeks, the only day-care,
8  after calling numerous day-cares that I could
9  come up with, had a waiting list of four weeks.
10 All the other ones had eight, ten or 12. And so
11 I told -- you know, before I left, I was talking
12 to Chuck Victor in Labor Relations about this. I
13 was talking to Virgil Collins. There was written
14 letters. There was e-mails. There was verbal
15 meetings in regards to this. And I
16 took -- we agreed that I would take those two
17 weeks off on my vacation and try to work
18 something out.
19 Q.   You and George agreed to that?
20 A.   Yes.
21 Q.   Okay. And then you subsequently resigned on
22 February 23rd?
23 A.   Yes, I did, after not being able to take
24 personal leave without pay.
25 Q.   Okay.

1  　　　　　　of the Victoria Elder Deposition
2  　　　　　　was marked for purposes of
3  　　　　　　identification.)
4  　　　　　MR. CHILDS: Okay. Sorry.
5  Wrong one.
6  BY MR. CHILDS:
7  Q.　This is Number 7.
8  A.　Uh-hum.
9  Q.　And is that your first leave -- is that your
10 written leave of absence request to Mr. Jumbert?
11 A.　Yes.
12 Q.　And this is because you were leaving,
13 because it says, "Personal issues have arisen
14 which require my immediate attention." What is
15 that?
16 A.　My sole care provider was my mother. And
17 she up and left town and got divorced from my
18 stepfather, leaving me high and dry. I did not
19 know she was leaving. And I needed immediate --
20 I needed somebody to watch my kids immediately,
21 and didn't have anybody.
22 Q.　Uh-hum.
23 A.　And other personal issues was my stepdad was
24 trying to commit suicide. And I was right in the
25 middle of all of that.

1  A. Yes.
2  Q. He denied you a leave of absence because of
3  the wage and hour issue; is that correct?
4  A. Yes.
5  Q. The overtime?
6  A. Yes.
7  Q. What do you base that upon?
8  A. I base that upon the fact that when -- that
9  we were getting along pretty much until the fact
10 that I started standing up with Liz Kish. And I
11 base that upon other things that happened during
12 that time, as well.
13 Q. And what are those?
14 A. The fact that I was thrown into Liz Kish's
15 job, which was not in my classification. And
16 there was somebody else that knew that position
17 and could do that better than I.
18 Q. And who was that?
19 A. Crissi Stevens.
20 Q. Did George ever say anything to you that
21 indicated that he was retaliating against you
22 because of the wage and hour issue?
23 A. Not really, except for the fact that he kept
24 saying, "I don't want to hear about it. And I
25 want you to work it out with family. Those girls

```
 1    A.    Yes.
 2    Q.    All right.  Was George upset when this
 3    letter was written?
 4    A.    Was he upset that I wrote it?
 5    Q.    No.  Was he upset with you regarding the
 6    getting along in the office -- or about the wage
 7    and hour?
 8    A.    I would say so, yes.
 9    Q.    Okay.  But at this point, you knew there was
10    a problem between the other three that you were
11    not involved in; is that correct?
12    A.    Correct.
13    Q.    Okay.  Let's go back again to the alleged
14    retaliation against you.  What else do you base
15    it upon?
16    A.    The fact that he threw me into Liz's
17    position, like I said.  I don't think he would
18    have done that, because he knew I wasn't
19    qualified.  And there was somebody that was
20    qualified to do that position.  And he knew that
21    it was a very stressful position, and that I was
22    not -- I was not up to doing that.
23    Q.    Did you ever ask him why he was doing it to
24    you?
25    A.    Yes.
```

1  Q.     And what did he say?
2  A.     "This is my job -- this is the job I am
3  giving to you.  If you don't like it, then you
4  know what you can do," is basically --
5  Q.     He told you that you could perform the work
6  and grieve, did he not?
7  A.     No.  That I could perform the work or
8  leave.  And that is when he wrote me up for
9  insubordination.
10 Q.     Okay.
11 A.     And that is when I did take it to Chuck
12 Victor.
13 Q.     And you filed a grievance; is that correct?
14 A.     When I went to Chuck Victor?  Yes.
15 Q.     Uh-hum.
16 A.     That is what this is, yes.  This Number 5.
17           MR. CHILDS:          Mark that,
18 please.
19           (Thereupon, Defendants' Exhibit 10
20           of the Victoria Elder Deposition
21           was marked for purposes of
22           identification.)
23           MR. CHILDS:          Can you mark
24 that?
25           (Thereupon, Defendants' Exhibit 11

1  BY MR. CHILDS:
2  Q.    But no one -- you are not aware of anyone in
3  the entire division of the department who had
4  been granted four weeks of unpaid leave, are you?
5  A.    In my -- in my department, no.
6  Q.    Okay.  Now, in April, you came and requested
7  your records; is that correct?
8  A.    Correct.
9  Q.    And when was the first date you actually
10 requested your records, if you remember, and of
11 whom?
12 A.    There were e-mails back and forth between
13 myself and John Elsey and Liz Kish.  And John
14 Elsey, I don't recall the dates.  It was probably
15 a week or so before we came in, actually, on
16 April 12th.
17 Q.    And I want to go specifically to the first
18 e-mail that was sent requesting your records.
19 A.    Uh-hum.
20 Q.    At that time, did anyone at the City of
21 Akron have any way of knowing that you were
22 contemplating or thinking about bringing
23 litigation against the City of Akron?
24 A.    I believe -- bringing litigation about?
25 Q.    Yes.