Google, Inc. v. EMSAT Advanced Geo-Location Technology, LLC et al.                    Doc. 59 Att. 5

1  not reported to Central Payroll in any form?
2  A.   Right.
3  Q.   Okay.
4  A.   That is correct.
5  Q.   And that is what you and the department
6  referred to as comp time?
7  A.   Well, no.  Comp time we considered was lunch
8  hours.
9  Q.   Okay.
10 A.   The flex time.
11 Q.   So what -- if you worked nine hours in a
12 day, what was that extra hour referred to as?
13 A.   Just one -- it was straight time.  But
14 nobody ever worked over eight hours.
15 Q.   Ever?
16 A.   Well, I -- I take that back.  I did quite a
17 few times.  I would be left -- I take that back.
18 Liz, on a couple of occasions, she was -- like 15
19 minutes over for a Board of Building Appeals.
20 So, technically, she would have been entitled to
21 time and a half for that 15 minutes.  And that
22 was only the first Tuesday of every month, 12
23 meetings a year.  And it didn't go over every
24 month.
25 Q.   So if Liz worked a Board meeting --

1  A.     Uh-hum.
2  Q.     -- and therefore accrued over eight hours in
3  any given day --
4  A.     Uh-hum.
5  Q.     -- you said that she would have been
6  entitled to time and a half for that extra time?
7  A.     I would think.
8             MR. CHILDS:      Object.  She can
9  answer.
10            THE WITNESS:     I would think.
11 BY MS. CORSO:
12 Q.     Okay.  As payroll clerk, where would that
13 extra time be recorded?
14 A.     On this comp time.
15 Q.     Okay.  And would it be recorded as time and
16 a half, or straight time?
17 A.     Straight time.
18 Q.     Okay.  And was that time reported to Payroll
19 in any function?
20 A.     No.
21 Q.     Okay.  Why do you believe that she would
22 have been entitled to time and a half?
23            MR. CHILDS:      I object.  But she
24 can answer.
25            THE WITNESS:     Over the eight

1  hours?
2  BY MS. CORSO:
3  Q.    Yes.
4  A.    Because I think anything worked over eight
5  hours, you should get time and a half for.
6  Q.    Okay.
7  A.    That is --
8  Q.    Do you know where you're receiving that
9  knowledge from? Somebody told you that? Have
10 you read it?
11 A.    It is in the union CSPA book.
12 Q.    Okay. And you stated that you would
13 sometimes work Board meetings?
14 A.    Uh-hum.
15 Q.    And worked over eight hours in a shift?
16 A.    Uh-hum.
17 Q.    I am sorry. You need to answer audibly.
18 A.    I am sorry. Yes. Yes. Yes.
19 Q.    Okay. Did you feel that you should also be
20 entitled to time and a half for that time?
21 A.    Yes.
22           MR. CHILDS:    I object. She can
23 answer.
24 BY MS. CORSO:
25 Q.    Did you ever state that to anyone?

AKRON COURT REPORTERS
330•376•8100

CANTON COURT REPORTERS
330•452•2400

CLEVELAND COURT REPORTERS
216•621•6969

1  A.   No. Only because I enjoyed the flex time.
2  So I didn't want to -- I thought 15 minutes, I
3  can live with --
4  Q.   Okay.
5  A.   -- as straight time. I am not going to
6  push.
7  Q.   Why do you feel that the flex time is
8  connected to the time and a half accrual for
9  hours worked over eight hours in a day?
10 A.   I don't understand the question.
11 Q.   You just said that you didn't report or --
12 or you never complained about not getting time
13 and a half for your Board meeting hours?
14 A.   Uh-hum.
15 Q.   Because you liked having the flex time?
16 A.   Correct.
17 Q.   What is the connection?
18 A.   Because we were able to basically come and
19 go as we pleased. If -- I mean, George -- if you
20 had something to do, George never denied you.
21 You always could go. You could leave on a whim
22 and say, "I need to take my lunch at 9:30."
23      "Okay. Be back at 10:30." You know, things
24 like that. It was spur of the moment things that
25 you could ask for, and he would let you do.

1  Q.   And do you feel that he would have taken
2  that right away if you needed -- if you asked to
3  be paid time and a half for overtime hours
4  worked?
5  A.   Yes.
6           MR. CHILDS:        Object.  She can
7  answer.
8           THE WITNESS:       Yes.
9  BY MS. CORSO:
10 Q.   Why do you say that?
11 A.   Why do I say what?
12 Q.   Why did you fear that that right would be
13 taken away?  The flex time?
14 A.   Because we had a meeting on it.
15 Q.   Okay.
16 A.   We had a meeting when Liz was demanding time
17 and a half for working through lunch.  And George
18 said he allows us to work through lunch to give
19 us flex time, to add these hours up.  And he said
20 he didn't force any of us to do it.  He never
21 made any of us stay.  And that if we didn't like
22 the flex time -- he was not going to approve time
23 and a half.  So we either took it or left it.  I
24 mean, it was like he said if not, then everybody
25 goes to lunch at their assigned time, period.

1   A. Yes.
2   Q. When did you throw these records away?
3   A. I don't recall. It was -- I don't know the
4   exact day. But it was from the time -- somewhere
5   in between from the time she resigned, I cleaned
6   out the files, and then the day she came in and
7   asked for them. So it was within that time
8   period.
9   Q. Why did you throw them away?
10  A. Because the practice had stopped. And it
11  had been stopped since July. Nobody had earned
12  any. So they were dead records. The practice
13  stopped. It was never going to happen again.
14  So it was an agreed situation, so I never --
15  I didn't think they were anything to save,
16  honestly.
17  Q. Did you ask anybody about throwing them
18  away?
19  A. No. Nuh-hum.
20  Q. Prior to this point in time, hadn't one of
21  your duties been involved with records retention
22  within the department?
23  A. Yes.
24  Q. And can you tell me what those duties were?
25  A. Just pack -- making the -- packing away all

of our files and getting them over to storage, recording what is being sent over there and what is in each box.

Q.  And how often did you do this type of packing away?

A.  At least once a year.

Q.  And during these times -- well, first of all, how many years have you been engaged in this process?

A.  I don't recall exactly. I want to say -- I remember I was pregnant. I just don't remember if it was my first or second child. So it would either have been seven or four years.

Q.  So you have gone through this process at least four times, possibly seven?

A.  To take records over there?

Q.  Yes.

A.  Yes.

Q.  And during this process, were records also discarded?

A.  No, not really.

Q.  Never?

A.  I shouldn't say never. We cleaned out files, yes. And some things were discarded. I mean, George saved everything. Phone messages --

1  so things like that we cleared out to save room
2  in the box.
3  Q.   As records retention clerk, were part of
4  your duties -- or in the records retention area,
5  was part of your duties making a list of any
6  records that were going to be destroyed?
7  A.   Yes.  But we -- we never did that, because
8  we never really destroyed anything that we wanted
9  rid of.
10  Q.   But you knew that was part of the process?
11  A.   Yes.
12  Q.   And who taught you this process?
13  A.   I went through some course with, I think,
14  the Law Department, for all record retention
15  officers.
16  Q.   Do you remember how -- do you remember when
17  that was?
18  A.   No.  Again, it was right when I became a
19  records retention officer.  It was either four or
20  seven years.  I want to say seven, probably.  I
21  don't know for sure.
22  Q.   Who is Bob White?
23  A.   Pay -- I think he is head of Payroll or
24  Accounting or -- I think he is the head of
25  Accounting, I think.  I don't know.

1  Q. Was he involved in records retention for
2  your division?
3  A. Not that I know of.
4  Q. When you decided to clean out the files and
5  throw away the comp time records, did you make
6  any list of the records that you were destroying?
7  A. No. They were -- the comp time records were
8  in other individual files, and I pitched all six
9  at once.
10 Q. All six --
11 A. All six files for each employee.
12 Q. There were six files for each employee?
13 A. Uh-hum.
14 Q. Is that going back one for each year, or --
15 A. No -- yes. Each -- because we -- I think
16 there was five years in the current cabinet, that
17 I said we kept the current ones. The rest were
18 in the back. So all I really cleaned out was the
19 ones in the filing cabinet. The current.
20 Q. So do the records in the back -- the back
21 years, do those still exist, to your knowledge?
22 A. Yes.
23 Q. And did you also throw out the black binder,
24 three-ring binder, or the contents thereof?
25 A. Just these.

```
 1  these out?
 2  A.    Right at my basket.  Or actually where the
 3  payroll clerk's desk was, while I was cleaning
 4  out, right there in that waste basket.
 5  Q.    Did anybody know that you were doing this?
 6  A.    No.
 7  Q.    Okay.  To your knowledge, did it ever come
 8  to Mr. Jumbert's attention that you had thrown
 9  out these records?
10  A.    Yes.
11  Q.    And when did it come to his attention, to
12  the best of your knowledge?
13  A.    After Vicki and Liz came in to request them.
14  Q.    And can you tell me what occurred?
15  A.    George asked me what I did, what had
16  happened.  I told him.  He wasn't very happy.  He
17  was quite upset.  He told me I should have asked
18  him, which I realized that I should not have done
19  that.  He was not happy at all.
20  Q.    Did anything else occur?
21  A.    No.  Not -- no.
22  Q.    Were you ever disciplined for throwing out
23  these records?
24  A.    Maybe -- I don't want to say -- maybe you
25  can call it verbal, because he was quite upset
```

```
 1    and let me know it.
 2    Q.    Nothing in your file?
 3    A.    No.
 4    Q.    Are you still handling the payroll functions
 5    today?
 6    A.    Yes.
 7    Q.    The other duties that Vicki Elder had, is
 8    anybody else handling those today?
 9    A.    Oh, yes.
10    Q.    Who else?  Was somebody hired in to fill her
11    spot?
12    A.    Yes.
13    Q.    Who was hired?
14    A.    Joe Maresco.  That is M-a-r-e-s-c-o.
15    Q.    And what is his position?
16    A.    He is a Permit Clerk I.
17    Q.    Do you know when he was hired?
18    A.    June of last year, I think it was.  Yes.
19    Q.    And was he an internal transfer, or was he
20    from the outside?
21    A.    Yes.  He was -- he transferred.
22    Q.    From what department?
23    A.    Water.
24    Q.    And did he work with permits before, to the
25    best of your knowledge?
```